

FILED & JUDGMENT ENTERED
Steven T. Salata

Jan 22 2013

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT FOR
THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **JOHN TIMOTHY EAGAN, III,** | ) 12-30525 |
| | ) |
| Debtor. | ) |

## ORDER CONFIRMING PLAN

This cause came before the Court on December 19, 2012, to consider confirmation of the *Amended Plan of Reorganization Pursuant to Section 1121(a) of the Bankruptcy Code*, as modified, filed by the debtor and debtor in possession, John Timothy Eagan, III (the "Debtor"). [Docs. 108, 145]. Having held a hearing on due and proper notice to all interested parties and having received evidence regarding confirmation of the plan, as well as any objections thereto, the Court makes the following:

### FINDINGS OF FACT

1.   The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in this Court on March 2, 2012.

2.   The Debtor is a real estate developer. His primary assets consist of ownership interests in three types of businesses (together, the "Corporate Holdings"): (a) the "commercial real estate entities," which own and/or operate subsidized housing developments throughout

MWH: 10121.001; 00005917.2

North Carolina; (b) the "development companies," which were the vehicles by which the Debtor and his business partners developed various residential subdivisions; and (c) the "financial/operating companies," which hold publicly traded securities or operate Internet sweepstakes businesses in conjunction with other investors.

3. With the exception of certain of the development companies,[1] the Debtor is a minority equity holder or member of the various business entities at issue.

4. The appropriate valuation of the Debtor's Corporate Holdings was a contested issue in the Debtor's bankruptcy case.

5. The Debtor retained The Finley Group ("TFG") as financial advisors to the bankruptcy estate. The services provided by TFG included valuation of the Corporate Holdings.

6. Upon motion of the United States Bankruptcy Administrator, the Court also appointed Edward P. Bowers of Middleswarth, Bowers and Co., L.L.P. as examiner (the "Examiner") pursuant to § 1104(c)(2) of the Bankruptcy Code. The Examiner's charge was to investigate the value of the Corporate Holdings.

7. As ordered by the Court, the Debtor filed TFG's initial report regarding the value of the Corporate Holdings on September 21, 2012. The Debtor filed an amended report by TFG on November 1, 2012. The Bankruptcy Administrator filed the Examiner's report on the value of the Corporate Holdings on November 12, 2012.

8. TFG concluded in its amended report that the Corporate Holdings had a fair market value of $963,214. The Examiner, on the other hand, opined that the fair market value of the Corporate Holdings was $1,262,815.

---

[1] The Debtor holds a 50% or greater membership interest in four of the eight development companies.

9. The Debtor filed his *Amended Plan of Reorganization Pursuant to Section 1121(a) of the Bankruptcy Code* (the "Original Plan") on November 20, 2012. The Original Plan generally provided for satisfaction of allowed secured claims through surrender of the underlying collateral. With respect to general unsecured claims (Class 13), including the allowed unsecured deficiency claims of secured creditors, the Original Plan afforded creditors an election between two distribution options.

10. Under Option A, holders of allowed unsecured claims would receive *pro rata* distributions of the Debtor's projected disposable income ("PDI") in six installments over a five-year period. The Debtor's PDI is derived from recurring annual distributions he receives as a minority member of the aforementioned commercial real estate entities, estimated at approximately $180,000 per year. Pursuant to Option B, holders of allowed general unsecured claims would receive their respective *pro rata* shares of $650,000, in a single payment within sixty days of the Original Plan's effective date.

11. The Original Plan further provided that the treatment afforded to the unsecured class would be determined according to the distribution option selected by a majority in number of those unsecured creditors voting to accept the Original Plan.

12. In addition, the Original Plan called for two alternative new value contributions from the Debtor's family members. If the unsecured class selected periodic distributions under Option A, the Debtor's mother agreed to contribute $24,489.65 (the amount of the Debtor's exemption claims in his bankruptcy schedules). The Debtor's brother also agreed to contribute a separate sum of $200,000. Thus, the total new value contribution under Option A amounted to $224,489.65.

13. If the unsecured class elected a single distribution under Option B, the new value contribution would include only $200,000 from the Debtor's brother. While the Debtor's mother also agreed to *loan* the Debtor the principal sum of $450,000 to fund the single distribution called for under Option B (the "Option B Loan"), such loan was not a new value contribution *per se*. Rather, it was an obligation that the Debtor would be required to repay with interest under the terms of the Original Plan.

14. Following approval of the Debtor's *Disclosure Statement Relating to Amended Plan of Reorganization Pursuant to Section 1125 of the Bankruptcy Code* (the "Disclosure Statement"), the Disclosure Statement, Original Plan, and ballots were mailed to creditors and other parties in interest for voting.

15. All secured creditors casting ballots voted in favor of confirmation. All but one of the unsecured creditors casting ballots voted to accept the Original Plan and elected distribution Option B (the $650,000 lump sum payment).

16. However, RL Regi-NC Sugarm, LLC ("RL-NC") voted against the Original Plan. Simultaneously, RL-NC marked Option A on its ballot (indicating a preference for periodic distributions). RL-NC is the holder of a disputed unsecured claim in the amount of $5,032,743.27 arising from a pre-petition judgment against the Debtor.[2] If allowed, RL-NC's claim would account for approximately 43% of all claims in the unsecured pool.

17. The Debtor filed a *Modification of Plan* (the "Modification") on December 17, 2012. The Modification bifurcated the class of general unsecured creditors (Class 13), such that the claim of RL-NC was separately classified as Class 13A. The Modification stated that RL-NC would receive payments equal to its *pro rata* share of the amounts that *would have been*

---

[2] The Debtor filed an objection to RL-NC's claim on December 11, 2012. [Doc. 125]. This objection remained pending as of the confirmation hearing.

MWH: 10121.001; 00005917.2      4

distributed to all unsecured creditors had they elected Option A as a group under the Original Plan. Under the Modification, distributions to RL-NC are anticipated to total $495,661.

18.   The principal amount of the Option B Loan from the Debtor's mother increased from $450,000 to $550,000 under the Modification. The Modification then provided that the remaining general unsecured creditors (Class 13B) would receive their *pro rata* share of $750,000, rather than the lower $650,000 amount set forth under Option B in the Original Plan, *less* the *pro rata* share of such amount that would be distributed to RL-NC if it were included in Class 13B. Thus, distributions to the claim holders in Class 13B would equal 57% of $750,000, or $427,500.

19.   The Modification would not adversely affect the treatment afforded to any creditor under the Original Plan. The Original Plan, as amended by the Modification, is referred to herein as "the Plan."

20.   After the filing of the Original Plan, but prior to the confirmation hearing, the North Carolina Supreme Court effectively banned operation of Internet sweepstakes businesses such as those operated by the financial/operating companies in which the Debtor holds an interest. *See Hest Technologies, Inc. v. State ex rel. Perdue*, __ N.C. __, __ S.E.2d __ (2012) (No. 169A11-2). This ruling had a negative impact on the overall valuations of the Corporate Holdings previously rendered by TFG and the Examiner.

21.   TFG performed a hypothetical liquidation analysis of the Debtor's estate in connection with the confirmation hearing. It estimated the estate's fair market value to be in the range of $786,047 to $979,141 following the North Carolina Supreme Court ruling referenced above. After deducting liquidation costs (which the Examiner did not dispute), TFG concluded

that the resulting amount available for distribution to unsecured creditors in a Chapter 7 liquidation would range from $653,845 to $825,699.

22. Based on differing views of the appropriate income capitalization rate to apply when valuing the commercial real estate entities, how to account for net working capital retained by those companies, and whether to apply discounts for the Debtor's minority ownership interests and related lack of control, the Examiner concluded that the liquidation value of the Debtor's estate would be $946,000 to $967,000.

23. The choice of income capitalization rate had no material net effect on the experts' competing conclusions. However, TFG's application of a slightly higher rate was supported by the testimony of an additional business valuation expert, W. Andrew Barbee, and other evidence of current market conditions for the types of assets at issue. It is also consistent with TFG's treatment of the net working capital of the commercial real estate entities.

24. With respect to such net working capital, the Court is persuaded by TFG's explanation that these assets would be subsumed in production of the net operating income of the commercial real estate entities given the ages of their underlying real properties. Therefore, it would be inappropriate to consider the net working capital as a separate component of the companies' overall value.

25. Applying principles enunciated by the United States Supreme Court in *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879 (1997), the Court also finds the application of a minority discount proper when gauging the fair market value of the Corporate Holdings. To determine an asset's fair market value, the Court must ascertain the cost the debtor would incur to obtain a like asset for the same use. *See Rash*, 520 U.S. at 965, 117 S.Ct. at 1886. Not applying a discount, as favored by the Examiner, artificially inflates the value of the

Debtor's minority ownership interests. This result would have a punitive effect under the best interests test of section 1129(a)(7)(A) (*i.e.*, by requiring the Debtor to pay *more* than the fair market value of the assets in order to retain them). Thus, application of the minority discount is appropriate.

26. The Court finds that the fair market value of the estate is $786,047 and its liquidation value is $653,845. The Corporate Holdings include minority interests in real estate businesses and companies that can no longer operate legally. It is speculative to conclude that a Chapter 7 trustee would yield anything other than the lowest end of the range presented by the Debtor when trying to sell such assets under current market conditions.

## CONCLUSIONS OF LAW

27. At the confirmation hearing, the contested issues were narrowed to three discrete disputes. First, the Bankruptcy Administrator asserted that the Plan is proposed in bad faith in violation of section 1129(a)(3) of the Bankruptcy Code. Second, RL-NC argued that the Plan fails to satisfy the best interest test of section 1129(a)(7)(A). Finally, RL-NC argued that the Plan violates the absolute priority rule as set forth in section 1129(b)(2)(B).

### *Allegations of Bad Faith Under 1129(a)(3)*

28. The Bankruptcy Administrator's concerns stem from the fact that the Debtor unilaterally loaned funds of the estate to one of his development companies without Court approval during the pendency of his bankruptcy case. These loans, which were made without the prior knowledge of Debtor's counsel, were disclosed in the Debtor's monthly operating reports and were ultimately repaid.

29. Although the Bankruptcy Code imposes the good faith requirement, it does not define the term "good faith." However, "[i]t is generally held that a plan is proposed in good

faith if there is a reasonable likelihood that the plan will achieve a result which is consistent with the objectives and purposes of the Bankruptcy Code." *See In re Renegade Holdings, Inc.*, 429 B.R. 502, 518-19 (Bankr. M.D.N.C. 2010) (citing *In re Madison Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)). A further refinement of the test for whether a plan is proposed in good faith is found in the notion that "the plan must provide for fundamental fairness in dealing with creditors." *Id.* (citing *In re New Valley Corp.*, 168 B.R. 73, 80 (Bankr. D.N.J. 1994)). When determining whether these standards of good faith have been met, the court should consider the totality of the circumstances surrounding the proposed plan. *See Renegade Holdings*, 429 B.R. at 519 (citing authorities). Section 1129(a)(3) "permits considerable judicial discretion to be exercised and equitable considerations such as fundamental fairness to creditors to come into play." *In re New Valley Corp.*, 168 B.R. 73, 81 (Bankr. D.N.J. 1994).

30. The unauthorized loans made by the Debtor to his company are not relevant to whether the Plan itself was proposed in good faith when all of the circumstances in this case are considered. The Plan, if confirmed, would duly restructure and/or satisfy the claims against the Debtor's estate and would provide the Debtor with the "fresh start" that is the underlying goal in any bankruptcy. Such results are consistent with the objectives and purposes of the Bankruptcy Code.

31. At the same time, while the Court does not conclude that the Plan violates section 1129(a)(3), neither does it condone the Debtor's actions in unilaterally making the loans at issue. The Court previously announced an award of professional fees in favor of the Debtor against the Bankruptcy Administrator's Office in this case. To deter such conduct in the future, the Court now concludes that the previously awarded sanction should be rescinded and no order requiring the payment of such fees by the Bankruptcy Administrator's Office will be entered. It is fortunate

that these short term loans were repaid.  Otherwise a more weighty sanction would pertain.

### *Satisfaction of the Best Interests Test Under Section 1129(a)(7)(A)*

32.     Section 1129(a)(7)(A) of the Bankruptcy Code requires that each holder of an impaired claim either accept the plan or "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date..."  Thus, to satisfy this "best interests" test the Debtor must demonstrate that the Plan will provide an equal or better recovery than would be provided to dissenting creditors in a Chapter 7 liquidation.  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 610 (Bankr. D. Del. 2001).

33.     Unsecured creditors could expect to receive $653,845 if the estate were liquidated under Chapter 7.  In contrast, the Plan provides for distributions to the two unsecured classes totaling $923,161 ($495,661 to RL-NC and $427,500 to all other unsecured creditors).

34.     Moreover, as shown in TFG's testimony and accompanying calculations, the net present value of the expected distribution to RL-NC under the Plan far exceeds what it would receive in a liquidation scenario.

35.     Therefore, the Plan satisfies the best interest test of section 1129(a)(7)(A).

### *Application of the Absolute Priority Rule and New Value Exception*

36.     In order to nonconsensually confirm, or "cram down," a plan of reorganization over the objection of a dissenting class, the plan proponent must demonstrate that the plan's treatment of that class is "fair and equitable."  11 U.S.C. § 1129(b)(1).  Section 1129(b)(2) sets forth certain criteria that must be met in order for a plan to be considered fair and equitable. When the dissenting class consists of unsecured claims, section 1129(b)(2)(B) requires that the

plan satisfy the two-prong "absolute priority rule," which existed in case law prior to the enactment of the Bankruptcy Code. Under this rule, either (i) the plan must provide for payment in full of the allowed amount of the unsecured claims in the dissenting class, or (ii) the holder of any claim or interest junior to the dissenting class (*i.e.*, equity owners in the debtor) may not receive or retain property on account of such claim or interest. *See generally In re Grandfather Mtn. Limited P'ship*, 207 B.R. 475, 491 (Bankr. M.D.N.C. 1996).

37. However, courts recognize an exception or corollary to the absolute priority rule, whereby equity may retain an interest in a reorganized debtor over the objection of a class of creditors whose claims are not paid in full, in exchange for a fresh contribution of new capital. *See In re Bonner Mall P'ship*, 2 F.3d 899, 906-07 (9th Cir. 1993); *Grandfather Mtn. Limited P'ship*, 207 B.R. at 492. The "new value exception" has been applied in individual Chapter 11 cases, as well as in corporate cases. *See, e.g., In re Davis*, 262 B.R. 791, 798 (Bankr. Ariz. 2001); *In re Draiman*, 450 B.R. 777, 822 (Bankr. N.D. Ill. 2011).

38. The new value exception requires a contribution of value that is "(1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received." *Bonner Mall P'ship*, 2 F.3d at 908-09. *See also In re 203 N. LaSalle St. Ltd. P'ship*, 126 F.3d 955, 964-65 (7th Cir. 1997); *Grandfather Mtn. Limited P'ship*, 207 B.R. at 492.

39. Further complicating this analysis, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") in 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005). BAPCPA amended various sections of the Bankruptcy Code, including the addition of a new clause in section 1129(b)(2)(B) applicable only in individual Chapter 11 proceedings. That provision now states that to be fair and equitable a plan must still satisfy the two-prong absolute priority rule described above, "*except* that in a case in which the debtor is an individual, the

debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section." 11 U.S.C. § 1129(b)(2)(B)(ii) (emphasis added). Section 1115, in turn, sweeps post-petition property and earnings acquired by the debtor into the ambit of "property of the estate" as that term is defined in section 541 of the Bankruptcy Code.

40. Courts have disagreed whether this amendment was intended by Congress to abolish the absolute priority rule in individual Chapter 11 cases altogether, effectively allowing the debtor to retain the entire bankruptcy estate, including property acquired post-petition, over the objection of a dissenting class. The Fourth Circuit Court of Appeals recently addressed this issue in *Maharaj v. Stubbs & Perdue, P.A. (In re Maharaj)*, 681 F.3d 558 (4th Cir. 2012), and held that the absolute priority rule *does* continue to apply in individual cases.

41. Importantly, following a thorough analysis of the admittedly ambiguous statutory language, the Fourth Circuit noted that if Congress had intended to abrogate the absolute priority rule in individual cases, it could have simply said just that: "[W]e are in agreement with those courts that have concluded that, if Congress intended to abrogate such a well-established rule of bankruptcy jurisprudence, it could have done so in a far less convoluted manner." *Id.* at 571. The Fourth Circuit added that when "interpreting the Code, we are mindful that courts 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.'" *Id.* (citing *Hamilton v. Lanning*, 130 S.Ct. 2464, 2467, 177 L.Ed. 2d 23 (2010)).

42. Similarly, this Court concludes that absent a legislative mandate to the contrary, the new value exception to the absolute priority rule also remains applicable in individual Chapter 11 cases.

43. The parties seemingly agree that the five-part *Bonner Mall* standard applies to determine the sufficiency of the new value contributions proposed by the Debtor. RL-NC challenges the substantiality and reasonable equivalence prongs of the test. It argues that a formulaic approach should be used, strictly comparing the relative values of the contribution to the total amount of unsecured debt in the case. The Debtor, on the other hand, argues that the Court should consider the totality of the circumstances in each case, including the additional requirements imposed upon individual Chapter 11 debtors under the BAPCPA amendments (including, for example, the five-year PDI commitment rule in section 1129(a)(15)(B)).

44. The Court concludes that there can be no formulaic approach for resolving these issues in every situation. The sufficiency of a new value contribution depends on the application of common sense to the circumstances presented in each unique case. *See, e.g., In re Snyder*, 967 F.2d 1126, 1131-32 (7th Cir. 1992) ("There is no mathematical formula for resolving the substantiality issue, and it will depend on the circumstances of the individual case.").

45. This is particularly true in the case of an individual debtor. The BAPCPA amendments were intended, in part, to keep individual debtors out of liquidation. Without "equity" such as shares or membership interests to offer an investor, however, an individual has far fewer options than a corporate debtor to raise new capital. Simultaneously, Congress has not imposed a requirement of universal consent by creditors to achieve confirmation in cases filed by individuals. A reasonable middle ground must therefore be found if individual Chapter 11 cases are to retain any practical utility.

46. In this case, the fair market value of the estate's assets is $786,047. Distributions under the Plan, including over $200,000 in fresh capital from the Debtor's family, are projected to exceed this value by at least $137,000.

47. The Court concludes that under these circumstances the new value contributions proposed by the Debtor in the Plan are both substantial and reasonably equivalent to the interest received or retained. Therefore, they satisfy the new value exception to the absolute priority rule as set forth in Bankruptcy Code section 1129(b)(2)(B).

48. Confirmation of the Plan is in the best interests of the Debtor, his estate, his creditors, and all other parties in interest.

49. All requirements for confirmation of the Plan set forth in 11 U.S.C. §§ 1127, 1129(a), and 1129(b) have been satisfied.

50. No further disclosure of the Modification is necessary.

**THEREFORE, IT IS ORDERED, ADJUDGED and DECREED that:**

1. All objections to the Plan are overruled; and

2. The Plan is hereby confirmed.

| | |
|---|---|
| *This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of this Order.* | *United States Bankruptcy Court* |